# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE:  **DUDLEY R. WEBB JR. and**                                **4:12-bk-10768 E**
       **PEGGY J. WEBB, Debtors**                            **CHAPTER NO: 7**

**BANK OF ENGLAND**                                                              **PLAINTIFF**

**v.**                                        **AP NO: 4:12-ap-1075**

**M. RANDY RICE, TRUSTEE; CARLTON FARMS, LLC;**
**USDA COMMODITY CREDIT CORPORATION;**
**USDA FARM SERVICE AGENCY, CNH CAPITAL AMERICA, LLC.**
**DEERE & COMPANY; DEERE CREDIT SERVICES, INC. d/b/a**
**JOHN DEERE CREDIT AND JOHN DEERE FINANCIAL; and**
**WELLS FARGO FINANCIAL LEASING, INC.**                  **DEFENDANTS**

**M. RANDY RICE, TRUSTEE**                          **COUNTER-CLAIMANT and**
                                             **CROSS-CLAIMANT**

**BANK OF ENGLAND**                                    **COUNTER-DEFENDANT**

**USDA COMMODITY CREDIT CORPORATION,**
**USDA FARM SERVICE AGENCY**                          **CROSS-DEFENDANTS**

### AMENDED AND SUBSTITUTED MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Three motions for summary judgment and responsive pleadings and briefs are pending in this case: (1) the *Motion for Summary Judgment on Behalf of the United States of America* (Dkt. #63); (2) the *Trustee's Motion for Partial Summary Judgment* (Dkt. #104); and (3) the *Bank of England's Motion for Summary Judgment* (Dkt. #106). This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This amended and substituted opinion amends the

Court's *Memorandum Opinion and Order on Motions for Summary Judgment* entered on

October 22, 2014, to make a clarification in the Background and Overview section; the

Court's rulings are not impacted by this clarification.

## BACKGROUND AND OVERVIEW

The Debtors, Dudley R. Webb, Jr. and Peggy J. Webb, are husband and wife who live

in Lonoke County, Arkansas, and have farmed in central Arkansas for a number of years.

In 2003, they formed the Dudley R. Webb, Jr. Farms Joint Venture (the **"Joint Venture"**)

to conduct their farming operations with Dudley and Peggy Webb each owning 50% in the

Joint Venture.  They periodically borrowed funds from both the Bank of England (the

**"Bank"**) and the United States of America, Department of Agriculture, Commodity Credit

Corporation (**"USDA-CCC"**) and Farm Service Agency (collectively referred to as **"USA"**)

to fund their farming operations.  Some of these loans were executed by the Debtors

individually and some were executed in the name of the Joint Venture.  The Debtors filed

bankruptcy on February 10, 2012.  The Bank initially filed a motion for relief from the

automatic stay to seize and sell the Debtors' 2011 rice crop, but then informed Randy Rice,

the Chapter 7 Trustee, that it intended to seize and sell the rice crop without Court authority

because it believed the rice crop was owned by the Joint Venture as a separate legal entity.

Because the Bank intended to sell property of the estate, the Trustee took immediate action

to protect that property and moved for a temporary restraining order which was granted on

April 2, 2012.  The Court held a hearing on April 11, 2012, and found that the Joint Venture

was not a separate entity and that the rice was therefore property of the Debtors' bankruptcy

2

estate protected by the automatic stay and should be sold by the Trustee who would hold the sale proceeds in an estate account, with the various parties' rights to those proceeds to be determined at a later date. The Trustee sold the rice crop for a total of $1,375,214.40 net proceeds, and the Trustee has since sold farming equipment and numerous vehicles for a total of $513,822.55 net proceeds.

This adversary proceeding was filed by the Bank on May 18, 2012, to ascertain its interests in the Debtors' property, including the 2011 rice crop as well as other property owned by the Debtors. The Trustee counterclaimed against the Bank and crossclaimed against the USA and Carlton Farms, LLC (**"Carlton Farms"**) (an entity that leased farmland to the Debtors). Carlton Farms also filed a crossclaim which has since been resolved. Due to a settlement reached between Carlton Farms and the Trustee, the Trustee now stands in the shoes of Carlton Farms, and there are only three parties now involved in this case: the Trustee, the Bank, and the USA.

The pending motions for summary judgment primarily concern the existence and perfection of security interests held by creditors Bank of England and the USA to the following assets of the bankruptcy estate which the Trustee has sold and is holding the proceeds: warehouse-stored rice, farm-stored rice, and certain vehicles and equipment. The Trustee contends the Bank's and USA's liens on this property were improperly granted or are unperfected and subject to avoidance in bankruptcy pursuant to 11 U.S.C. § 544(a). Specifically, the Trustee contests whether the Joint Venture could grant legally enforceable security interests in property owned by the Debtors individually. The Trustee concedes that

3

the USA has a perfected security interest in the warehouse-stored rice, provided it holds a legally enforceable security interest,[1] but contests the USA's security interest in the farm-stored rice. The Trustee contests the perfection of the Bank's security interests in both the warehouse rice and farm-stored rice. The Trustee also challenges the USA's and Bank's security interests in certain vehicles and equipment which the Trustee has sold. As explained below, the Court finds that the USA and Bank hold legally enforceable perfected security interests in the warehouse-stored rice, the farm-stored rice, and the equipment sold by the Trustee, with the exception of those vehicles with no titles showing a lien recorded by the Bank or USA.

Each of the three parties also moves for summary judgment with respect to an amount due Carlton Farms under its lease agreement with the Debtors. The Trustee seeks a ruling that he is entitled to collect $52,159.25 due Carlton Farms (which has assigned its interest to the Trustee pursuant to a settlement) as either rent due Carlton Farms subject to a superpriority landlord's lien under Arkansas law or a property interest held by Carlton Farms. The Bank and USA both assert that the amount at issue does not constitute rent. Having examined the lease agreement, the Court finds the Trustee is entitled to this amount as a matter of law because there is no question the amount due Carlton Farms is for rent and the

---

[1] Determining whether a creditor holds a legally enforceable security interest in collateral is a separate inquiry from whether that security interest is properly perfected. This opinion addresses multiple issues concerning obtaining and perfecting valid security interests in crops and agricultural equipment. Because these issues are commonplace yet complex, the Court includes its extensive research in this Opinion in hopes of deterring future litigation of these issues.

4

Trustee holds the rights of Carlton Farms.

The Trustee also seeks to surcharge the Bank's and USA's security interests under 11 U.S.C. § 506(c). The Court cannot determine whether the Bank's and USA's security interests are subject to surcharge on summary judgment due to certain outstanding issues of fact.

The Trustee and the Bank also move for summary judgment with respect to a check from England Liquid Fertilizer, Inc. (**"ELF"**), a co-op in which separate Debtor Dudley Webb owns 100 shares. The Bank caused the check from ELF to be deposited with the Bank post-petition and has since held those funds (the **"ELF Funds"**). The Bank argues that the ELF Funds represented a rebate for fertilizer purchased by the Debtors and that the Bank is entitled to keep those funds because it holds a security interest in all of the Debtor's fertilizer and accounts and other rights to payment. The Trustee argues that the Bank does not have a security interest in the ELF Funds because the check was issued as a rebate based on the Debtors' ownership of 100 shares in ELF and the Bank does not have a security interest in the Debtors' ELF stock. The Trustee also argues that the post-petition transfer of the check from ELF to the Bank is avoidable as a post-petition transfer under 11 U.S.C. § 549 regardless of any security interest the Bank may hold in the ELF Funds. The Bank disputes that the transfer occurred post-petition but the Court finds the transfer of the check from ELF to the Bank was made post-petition and is avoidable pursuant to § 549(a) regardless of whether the Bank has a security interest in the ELF Funds. Although the Court finds that the transfer of the ELF Funds is avoidable, the Court must still determine whether the Bank has

5

a security interest in the ELF Funds in order to determine the amount of the Bank's secured claim under 11 U.S.C. §§ 502(h) and 506(a).

Finally, the Bank moves for summary judgment on other avoidance actions brought by the Trustee, as well as the Trustee's counterclaims for disallowance of claims, equitable subordination, and violation of the automatic stay. Summary judgment as to these issues is denied as issues of material fact remain to be decided at trial.

## UNDISPUTED FACTS[2]

### The Debtors and Their Joint Venture

1.      On or about January 1, 2003, Dudley R. Webb, Jr. and Peggy J. Webb entered into an agreement creating the Joint Venture with farming and other activities related thereto being the general nature of the business to be transacted by the Joint Venture and with Dudley and Peggy Webb each owning 50% in the Joint Venture.  USA St. Undisputed Facts (Dkt. #65) ¶ 1; Trustee St. Undisputed Facts (Dkt. #109) ¶ 2; Bank St. Undisputed Facts (Dkt. #107) ¶ 1.

2.      Since the Joint Venture was created in 2003, it has engaged in farming and other farm related activities in and around central Arkansas, including Lonoke and Pulaski Counties. USA St. Undisputed Facts ¶ 2; Trustee St. Undisputed Facts ¶ 1.

3.      Dudley R. Webb, Jr. and Peggy J. Webb, husband and wife, live in Lonoke

---

[2] Each party filed a statement of undisputed facts in this case; the Court compiled those facts here, noting any instance where a legal conclusion was stated instead of a fact or any fact that was actually disputed.  The Court also includes in its undisputed facts orders and facts gleaned from the docket in this case (such as what the trustee reported in his report of sale).

6

County, Arkansas. USA St. Undisputed Facts ¶ 43.

4.      The Joint Venture deposited 142,946.53 bushels of its 2011 crop year rice for storage at the Federal Drier and Storage Company, Inc. in England, Arkansas (the **"Warehouse Rice"**).  USA St. Undisputed Facts ¶ 3; Bank St. Undisputed Facts ¶ 6.

5.      The Joint Venture stored 84,339.77 bushels[3] of its 2011 crop year rice in bins on the Pulaski County, Arkansas farm previously leased by the Debtors from Carlton Farms (the **"Farm-Stored Rice"**).  USA St. Undisputed Facts ¶ 19; Bank St. Undisputed Facts ¶ 6.

6.      The Debtors and the Joint Venture granted security interests in crops, including the 2011 crop year rice, as well as certain vehicles and equipment, to the USA and Bank. The USA and Bank filed various financing statements to perfect their security interests in the Debtors' and Joint Venture's 2011 crops and equipment.  Bank Mt. Summ. Judg.; USA Mt. Summ. Judg.

7.      On February 10, 2012, the Webbs filed a joint Chapter 7 personal bankruptcy in the Bankruptcy Court for the Eastern District of Arkansas.

8.      Post-petition, after filing a motion for relief from stay in the Debtors' main bankruptcy case, the Bank attempted to exercise control over the Warehouse Rice and Farm-Stored Rice.  The Trustee sought a temporary restraining order and preliminary

---

[3] The Trustee states the Farm-Stored Rice consisted of 105,000 bushels of rice in his statement of undisputed facts (¶ 4), but his report of sale indicates that 84,339 bushels of rice were sold in addition to the 142,946.53 bushels of Warehouse Rice. *See Amended Report of Sale* (Dkt. #170).

injunction, which necessitated a full-day hearing related to such issues before the Court on April 12, 2012, in adversary proceeding 4:12-ap-1044. The Trustee incurred attorneys' fees and expenses in connection with bringing such action. Trustee St. Undisputed Facts ¶ 18; *see also Order Approving Application for Attorney Fees and First Interim Application for Fees and Expenses for Keech Law Firm, PA, Counsel to the Trustee* entered on August 21, 2014 (Dkt. #242).

9.    At the close of the April 12, 2012 hearing, the Court granted a permanent injunction enjoining the Bank from taking control over the Debtor's assets including property the Bank asserted was held by the Joint Venture. The Court orally ruled that the Trustee may immediately sell the grain at issue and hold the proceeds from sale in an estate account, with the various parties' rights to those proceeds to be determined at a later date. *See Order Granting Injunction* (Dkt. #41); *Rice v. Carlton Farms, LLC (In re Webb)*, 474 B.R. 891, 894 (Bankr. E.D. Ark. 2012).

10.    The Court's *Order Granting Injunction* entered on July 3, 2012, held that the Joint Venture was not a separate legal entity, but represented an agreement between the individual Debtors to continue their farming operations; the Court's decision was affirmed on appeal to the Eastern District of Arkansas to the Eighth Circuit Court of Appeals. *See Rice v. Carlton Farms, LLC (In re Webb)*, 474 B.R. 891, 894 (Bankr. E.D. Ark. 2012), aff'd sub nom., No. 4:12-cv-578 (DPM), 2013 WL 427919 (E.D. Ark. Feb. 4, 2013), aff'd, 742 F.3d 824 (8th Cir. 2014). Because the Joint Venture was not a separate entity, the Court held that the Debtors individually owned the rice and equipment listed on their bankruptcy

8

schedules.  *Id.*

## Sales by Trustee

11.     According to the Trustee's *Amended Reports of Sale* (Dkt #170), the rice sold for net proceeds totaling $1,375,214.40, with all liens, interests, and claims to the rice attaching to such proceeds. The Trustee paid expenses of $11,576.77 in connection with this sale.

12.     According to Reports of Sale filed by the Trustee, the equipment and vehicles sold for net proceeds totaling $513,822.55, with all liens, interests, and claims to the equipment and vehicles attaching to such proceeds.  *See Report of Sale* (Dkt. #126); *Report of Sale* (Dkt. #173); *Amended Report of Sale* (Dkt. #186).

13.     Of the $513,822.55 net proceeds collected, $384,322.55 was collected in a public sale of equipment, and $129,500 was collected in a private sale.  Specifically, the Report of Sale for the public sale of the Webbs' equipment reported that the Trustee collected a total of $422,571.50 gross proceeds, incurred an auctioneer's fee of $29,580.01, and incurred other expenses totaling $8,668.94, for total net proceeds of $384,322.55.  *See Report of Sale* (Dkt. #126).  On September 12, 2012, this Court entered an order approving the Trustee's application for authority to pay the commission and expenses of the auctioneer who conducted the public sale of the equipment, directing the Trustee to pay Doug Stovesand, Auctioneer, commission in the amount of $29,580.01 and expenses incurred in the amount of $8,668.94.  *See Order Approving Payment of Commission and Expenses To Doug Stovesand, Auctioneer* (Dkt. #154).  The Reports of Sale for the private sales of the Webbs'

equipment reported that the Trustee collected a total of $129,500, and stated that "[t]here were no commissions or expenses incurred or paid as a result of these private sales." *See Report of Sale* (Dkt. #173); *Amended Report of Sale* (Dkt. #186).

14.    Part of the equipment sold by the Trustee included several vehicles owned by the Debtors, including those described in Exhibit 5 to the Trustee's Motion for Partial Summary Judgment (referred to herein as the **"Vehicles"**) and listed here with the amount received by the Trustee for each:

| Description | VIN Number | Amount |
|---|---|---|
| 2 Axle Trailer - Red | 5FLP18207B041041 | $     500.00 |
| 40ft Hopper Bottom Trailer | 1DW1A4222DS406101 | 6,100.00 |
| 1954 ARM Trailer | 2844918 | 775.00 |
| 1987 Ford CB | 1FTXR82A8HVA50653 | 3,200.00 |
| 1968 Ford Bob Truck | N60DUD04249 | 800.00 |
| 2009 Falcon Trailer | 432SD182891018642 | 1,700.00 |
| 1980 Atok LB | AT125979 | 3,300.00 |
| 1995 Spta TL | 1S9GH4222SM451169 | 15,000.00 |
| 1975 Shop TL | ARKAVTL lO175743 | 1,000.00 |
| 1983 Intl DS | 1HTL23277DGA16105 | 2,500.00 |
| **TOTAL** | | **$   34,875.00** |

The Vehicles generated gross sales proceeds totaling $34,875.00 at auction. At the commencement of the Debtors' bankruptcy case, no liens were recorded on the certificates of title for the Vehicles.  Trustee St. Undisputed Facts ¶ 14.  The Trustee

attached copies of titles for eight of the Vehicles and an Arkansas Interactive Title Registration and Lien Report Summary dated April 16, 2014 for all the Vehicles which show that titles were issued for the two trailers for which the Trustee has no title, but that no liens were recorded on those trailers.  *See* Trustee Mt. Summ. Judg. Exh. 6.

### The Bank Loans

15.    At various times prior to the filing of the Chapter 7 Petition herein, for good and valuable consideration, Dudley R. Webb, Jr., Peggy Webb, individually and/or through the Joint Venture executed and delivered to the Bank various Promissory Notes and related instruments, which evidence various loans and extensions of credit from the Bank to the Debtors (collectively, the **"Bank Loans"**).  Valuable consideration was given by the Bank to the Debtors in connection with Debtors' execution and delivery of these various notes and agreements and the making of each of the Bank Loans. The notes and related agreements attached to the Bank's Motion for Summary Judgment as Collective Exhibit B represent and evidence the Debtors' obligations which remain unpaid in connection with the following Loans, to-wit:

    a.    Bank Loan No. 107177;

    b.    Bank Loan No. 111731;

    c.    Bank Loan No. 124634;

    d.    Bank Loan No. 130222;

    e.    Bank Loan No. 130223;

    f.    Bank Loan No. 132906;

11

g.    Bank Loan No. 301921;

h.    Bank Loan No. 301954; and

i.    Bank Loan No. 305419.

All of the notes and instruments related to the foregoing Bank Loans are herein collectively referred to as the **"Bank Notes"**.  Bank St. Undisputed Facts ¶ 2.

16.    To secure payment of the amounts owed to the Bank in connection with the Loans, the Notes, and all other debts of the Debtors existing or thereafter created, the Debtors executed and delivered to the Bank the various security agreements and extensions. All of the foregoing instruments are herein collectively referred to as the **"Bank Security Agreements"**  and were attached to the Bank's Motion for Summary Judgment as Collective Exhibit C.  Bank St. Undisputed Facts ¶ 3.  With one exception (*see* Collective Exhibit C, p. 15), all of the Bank Security Agreements secured all existing and future debts.

17.    The Bank attempted[4] to perfect and maintain each of the security interests granted by the foregoing Bank Security Agreements by filing UCC Financing Statements and continuations in the appropriate filing office all of which are collectively referred to herein as the **"Bank Financing Statements"** and were attached to the Bank's Motion for

---

[4] The Bank actually lists as an undisputed fact that it perfected and maintained its security interests by filing UCC financing statements in the appropriate filing office.  Bank St. Undisputed Facts ¶ 4-5.  The Bank goes on to allege it is undisputed that all liens granted by the Bank Security Agreements were perfected in ¶ 7-8. The perfection of the Bank's security interests is disputed and is the subject of this Order.

Summary Judgment as Collective Exhibit D.  Bank St. Undisputed Facts ¶ 4.  The following chart describes those financing statements:

| # | Debtor/Borrower(s) | Date | Location | Collateral |
|---|---|---|---|---|
| 01386367 | Dudley R. Webb, Jr. and Peggy J. Webb | 2/12/2002 | Sec. of State | Various including farm products, but not equipment |
| 85319[5] | Dudley R. Webb, Jr. and Peggy J. Webb | 2/19/2002 | Lonoke County | Various including farm products, but not equipment |
| 41259521120 | Dudley R. Webb, Jr. and Peggy J. Webb | 3/3/2004 | Sec. of State | Equipment (specific list provided) |
| 86782 | Dudley R. Webb, Jr. and Peggy J. Webb | 3/3/2004 | Lonoke County | Equipment (specific list provided) |
| 7128172482 | Dudley R. Webb, Jr. and Peggy J. Webb | 2006* | Sec. of State | Specific items of equipment |
| 7128373883* | Dudley W. Webb | 6/2/2006 | Sec. of State | Specific items of equipment |
| 7129168740 (cont. of 01386367) | Dudley R. Webb, Jr. and Peggy J. Webb | 1/29/2007 | Sec. of State | Various including farm products, but not equipment |
| 200800137 *Paid for Termination stamp | Dudley R. Webb, Jr. Farms, Joint Venture | 2/15/2008 | Lonoke County | Specific items of equipment |
| 7130278140 | Dudley R. Webb, Jr. Farms, Joint Venture | 2/11/2008 | Sec. of State | Specific items of equipment |
| 7130369048 | Dudley R. Webb, Jr. Farms, Joint Venture | 3/11/2008 | Sec. of State | Specific items of equipment |
| 7131598221 | Dudley R. Webb, Jr. Farms, Joint Venture | 6/16/2009 | Sec. of State | Specific items of equipment |
| 4000000819103 | Dudley R. Webb, Jr. | 2/25/2010 | Sec. of State | Specific items of equipment |

---

[5] Financing statement #85319 was not attached as part of Collective Exhibit D, but was attached to the Bank's Response to the Trustee's Motion for Partial Summary Judgment as Exhibit 1-D (Dkt. #120-1, p. 9-10).

| 40000025392358 | Dudley R. Webb, Jr. Farms, Joint Venture | 1/31/2011 | Sec. of State | Various including farm products and equipment |
| 4000002543020 (Cont. Of 7128172482) | Dudley R. Webb, Jr. and Peggy J. Webb | 2/1/2011 | Sec. of State | Specific items of equipment |
| 40000027029892 | Dudley R. Webb, Jr. Farms, Joint Venture | 3/2/2011 | Sec. of State | Various including farm products and equipment |
| 4000004445056 (cont. of 1386367) | Dudley R. Webb, Jr. and Peggy J. Webb | 2/8/2012 | Sec. of State | Various including farm products, but not equipment |

*The Court had difficulty reading these numbers and/or dates due to the Court's Electronic Case Filing stamp across the top of the documents.

18.    The Bank attempted to perfect and maintain its security interests in various titled vehicles of the Debtors by having the Bank's lien stated on the titles of such vehicles all of which were attached to the Bank's Motion for Summary Judgment as Collective Exhibit E.  Bank St. Undisputed Facts ¶ 5.  These are not the same vehicles as those listed in Paragraph 15 above.

19.    Debtors have defaulted on the Bank Notes and Bank Loans, and as of February 21, 2012, the total amount of indebtedness owed to the Bank totaled $1,406,330.45, with interest accruing thereafter at the rate of $272.67. The Bank asserts a secured claim against the rice proceeds and equipment and vehicle proceeds in the amount of $1,406,330.45, as of February 21, 2012, with interest accruing thereafter at the rate of $272.67.  Bank St. Undisputed Facts ¶ 9.

20.    As of February 21, 2012, the Debtors owed the Bank $1,406,330.45 as reflected on the Bank's Proof of Claim filed in the Debtors' bankruptcy attached to the

14

Bank's Motion For Summary Judgment as Exhibit F.[6]  Bank St. Undisputed Facts ¶ 10.

21.     The Bank does not dispute that the USA has priority over the Bank's claim against the rice proceeds.  Bank Mt. Summ. Judg. ¶ 9.

### USA Loan:  Warehouse Rice

22.     From September 12, 2011 through December 9, 2011, the Joint Venture made five deposits of its 2011 crop year rice for storage at the Federal Drier and Storage Company, Inc. in England, Arkansas (the **"Warehouse Rice"**), and with each deposit was given an original negotiable warehouse receipt for the rice.  USA St. Undisputed Facts ¶ 3.

23.     In order for the Joint Venture to pledge its rice as collateral for USDA-CCC loans, on December 15, 2011, the Bank executed a USDA Form CCC-679 Lien Waiver, which expressly waived—with respect to the USDA-CCC only—all of the Bank's interest in, and title to, the rice and all other commodities of the Joint Venture for crop year 2011, thereby making the Bank's lien on the rice subordinate to USDA-CCC's lien. USA St. Undisputed Facts ¶ 5.

24.     On December 23, 2011, the Joint Venture, by and through Dudley R. Webb, Jr., executed and delivered to the USDA-CCC a Warehouse Storage Note and Security

---

[6] According to the Bank's Statement of Undisputed Facts, the Bank's Complaint filed in this adversary proceeding incorrectly states the amount of indebtedness owed as $1,037,133.92. This lower amount reflects certain reductions or "charge-offs" required by the Bank's regulators to the Bank's books, but such reductions do not discharge the Debtors' liability on the Bank Loans.  Bank St. Undisputed Facts ¶ 10.

Agreement, representing a warehouse-stored rice marketing assistance loan made to the Joint Venture in the amount of $434,513.86, at an interest rate of 1.125% and a maturity date of September 30, 2012.  (Of this amount, the USA retained a $57 service fee.)  Trustee St. Undisputed Facts ¶ 6; USA St. Undisputed Facts ¶ 4, 6-8.

25.    The USA perfected its security interest in the Warehouse Rice by obtaining possession of certain warehouse receipts for same.  Trustee St. Undisputed Facts ¶ 6; USA St. Undisputed Facts ¶ 9-12, 14.[7]

26.    After obtaining the original endorsed warehouse receipts from the USDA-CCC under this Court's order, the Trustee had all rice stored by the Joint Venture at the warehouse sold, receiving $869,114.90 in net proceeds from the warehouse for the sale of said rice.  USA St. Undisputed Facts ¶ 13; Trustee St. Undisputed Facts ¶ 7.

27.    As of the February 10, 2012 date of the Chapter 7 bankruptcy filing of Dudley R. Webb, Jr. and Peggy J. Webb, the debt owed by the Joint Venture to the USDA-CCC on the Warehouse Rice loan totaled $435,143.31, with interest continuing to accrue at $13.3926 daily.  USA St. Undisputed Facts ¶ 15.

28.    The Trustee has not paid the USDA-CCC's secured claim on the Warehouse Rice proceeds.  USA St. Undisputed Facts ¶ 17.[8]

---

[7] Detailed undisputed facts concerning the USA's perfection of its security interests are omitted because the Bank and Trustee concede the USA's security interest in the Warehouse Rice is perfected.

[8] The USA asserts as an undisputed fact that it is vastly oversecured because the Trustee received $869,114.90 for the sale of the Warehouse Rice, and it is owed only $435,143.31.  USA St. Undisputed Facts ¶ 17.  The USA claims that as an oversecured creditor, the USDA-CCC's

## USA Loan:  Farm-Stored Rice

29.     The Joint Venture also stored a large quantity of crop year 2011 rice in grain bins located on land owned by Carlton Farms in Pulaski County, Arkansas (the **"Farm-Stored Rice"**).  USA St. Undisputed Facts ¶ 19.

30.     On December 28, 2011, the Joint Venture, by and through Dudley R. Webb, Jr., executed and delivered to the USDA-CCC a Farm Storage Note and Security Agreement representing a farm-stored rice marketing assistance loan made by the USDA-CCC to the Joint Venture in the amount of $293,895.00, with an interest rate of 1.125 % and a maturity date of September 30, 2012. USA St. Undisputed Facts ¶ 20; Trustee St. Undisputed Facts ¶ 8.

31.     The Farm-Stored Rice loan was made by the USDA-CCC to the Joint Venture after the Bank expressly waived its lien on the Joint Venture's rice with respect to the USDA-CCC.  USA St. Undisputed Facts ¶ 21.

32.     Under the terms of the Farm Storage Note and Security Agreement, the Joint Venture granted the USDA-CCC a security interest in all of its 2011 rice stored in bins on a farm located at "SE Corner of HWY 161 & River Road," a total then-approximated to be 47,250 cwt.  USA St. Undisputed Facts ¶ 22.

33.     Also on December 28, 2011, Dudley R. Webb, Jr., on behalf of the Joint

---

secured claim on the proceeds from the sale of the Warehouse Rice continues to accrue interest, causing an ongoing and increasing detriment to the bankruptcy estate of individual debtors. USA St. Undisputed Facts ¶ 18.  This may be correct, but it is not undisputed – the Trustee challenged the grant of the security interest in the rice to the USA.

Venture, executed USDA Form CCC-666 Farm Stored Loan Quantity Certification, certifying among other things, that: the Joint Venture was the producer of the approximated 47,250 cwt of the Farm-Stored Rice stored in the designated bins; the Joint Venture owned a beneficial interest in this Farm-Stored Rice and could pledge it to the USDA-CCC as security for the Farm-Stored Rice loan requested; the Farm-Stored Rice was in storable condition which would be maintained; the bins would safely store the Farm-Stored Rice through the maturity date of the loan; and the Farm-Stored Rice was not encumbered by any other liens or other security interests, except that of the Bank (which had given the USDA-CCC a Lien Waiver).  USA St. Undisputed Facts ¶ 23.

34.    The USA does not have (and has not had) possession of receipts for the Farm-Stored Rice.  Trustee St. Undisputed Facts ¶ 8.

35.    The $293,844.00 in loan funds from the Farm-Stored Rice loan was paid by the USDA-CCC jointly to the Joint Venture and the Bank per the terms of the CCC-678 Lien Waiver with the Bank. (The total loan amount was $293,895.00 but the USDA-CCC retained a $51.00 service fee.)  USA St. Undisputed Facts ¶ 24.

36.    The Farm-Stored Rice loan gave the Joint Venture until September 30, 2012 (more than nine months) to market its Farm-Stored Rice and sell same when the price for rice was advantageous to the Joint Venture, which would allow the Joint Venture to pay off the USDA-CCC loan in full, plus interest, and retain the remainder of the proceeds for the Joint Venture's use and benefit.  USA St. Undisputed Facts ¶ 25.

37.    The USDA-CCC filed UCC Financing Statements in the name of "Dudley

18

R. Webb Jr. Farms JV" with the Pulaski County Circuit Clerk's Office December 15, 2011, and with the Lonoke County Circuit Clerk's Office on December 20, 2011.  USA St. Undisputed Facts ¶ 26.  These financing statements listed the collateral as "all 2011 crops."  USA Mt. Summ. Judg., Exhibit J (Dkt. #63-10, p. 1-2), Exhibit G (Dkt. #63-7, p. 22-23); Trustee Mt. Summ. Judg., Exhibit 3B (Dkt. #104-3, p. 2-3).

38.    By order of this Court, the Trustee was given authority to sell the Farm-Stored Rice pledged by the Joint Venture to the USDA-CCC as security for the Farm-Stored Rice loan the USDA-CCC made to the Joint Venture, with all liens to attach to the proceeds thereof.  USA St. Undisputed Facts ¶ 27.

39.    Because of the USDA-CCC's lien on the Farm-Stored Rice, the Farm-Stored Rice could not have been sold without the Marketing Authorizations from the USDA-CCC.  USA St. Undisputed Facts ¶ 28.

40.    After obtaining the Marketing Authorizations from the USDA-CCC, the Trustee, through a broker, sold the Farm-Stored Rice on or about May 9, 2012, for a total of approximately \$506,099.50,[9] with these proceeds being held in an account by the Trustee, with all liens attached thereto.  USA St. Undisputed Facts ¶ 28; Trustee St. Undisputed Facts ¶ 9.

41.    As of the February 10, 2012 date of the Chapter 7 bankruptcy filing of

---

[9] According to the Trustee's *Amended Report of Sale* (Dkt. #170), the Farm-Stored Rice sold for \$515,746.50; when the expenses not associated with the Federal Drier Storage Company are deducted, the net proceeds from the sale of the Farm-Stored Rice total \$506,099.50.

Dudley R. Webb, Jr. and Peggy J. Webb, the debt owed by the Joint Venture to the USDA-CCC on the Farm-Stored Rice loan totaled $294,275.44, with interest continuing to accrue at $9.0581 daily.  USA St. Undisputed Facts ¶ 39.

42.    The Trustee has not paid the USDA-CCC's claim on the Farm-Stored Rice proceeds.[10]  USA St. Undisputed Facts ¶ 41.

### USA Loan:  Vehicles and Equipment

43.    On January 25, 2010, the Debtors executed a security agreement with the USA (specifically, the USDA Farm Service Agency or **"USDA-FSA"**) as security for several separate loans totaling $379,131.77. The USA filed a proof of claim for $129,838.21, the claimed outstanding amount due on these loans.  In the related security agreement, the Debtors, in their individual capacities, purported to grant the USA a security interest in over one hundred pieces of equipment, and references "all existing and future indebtedness" as its subject.  USA St. Undisputed Facts ¶ 44-47; USA Mt. Summ. Judg. Exh. N. (Dkt. #63-14, p. 1).

44.    At the time of the Webbs' Chapter 7 bankruptcy filing, Dudley R. Webb, Jr. and Peggy J. Webb were personally indebted to the USDA-FSA in the total amount of $129,838.21. Said sum representing $111,755.78 in unpaid principal, plus accrued interest through February 10, 2012, in the amount of $18,082.43, with interest accruing

_____

[10] The USA lists as an undisputed fact its status as an oversecured creditor and the detriment caused to the Debtors' estate by the Trustee not paying the USA's claim and accrual of interest.  USA St. Undisputed Facts ¶¶ 40, 42.  Again, the USA may be correct as to its status as an oversecured creditor, but it is not undisputed – the Trustee disputes the validity and perfection of the USA's liens on the Farm-Stored Rice.

thereafter at the rate of $14.9263 per day.  USA St. Undisputed Facts ¶ 52.

45.     Consistent with the USDA-FSA's personal loans to the Webbs, and the Notes and Security Agreements personally executed by the Webbs, the USDA-FSA filed a UCC Financing Statement in the names of Dudley R. Webb, Jr. and Peggy J. Webb in the Office of the Lonoke County Circuit Clerk as Document No. 082011 on January 21, 2000, covering, among other things, all the Webbs' equipment, and timely continued its financing statement by filing continuations on August 5, 2004, as File No. 082011 and again on September 9, 2009 as Document No. UCCFINST200900651.   USA St. Undisputed Facts ¶ 48; USA Mt. Summ. Judg., Exh. 0 (Dkt. #63-15); Trustee St. Undisputed Facts ¶ 12; Trustee Mt. Summ. Judg., Exh. 4-C (Dkt. #104-4, p. 80-82).

46.     Any financing statement filed by the Bank on the Webbs' equipment was filed after USDA-FSA's financing statement.  USA St. Undisputed Facts ¶ 49.

47.     No other creditor has a valid UCC Financing Statement covering the Webbs' equipment that was filed prior to the USDA-FSA's UCC filing.  USA St. Undisputed Facts ¶ 50.

## The "Landlord's Share" Asserted by the Trustee as Successor to Carlton Farms

48.     Carlton Farms, as landlord, leased certain farmland in Pulaski County, Arkansas to the Joint Venture, as tenant, for the period of January 1, 2011 through December 31, 2011, per the terms of a Farm Lease and Security Agreement (hereinafter the **"Farm Lease"**) executed on December 13, 2010, by an authorized agent of Carlton Farms and Dudley R. Webb, Jr. on behalf of "Dudley R. Webb, Jr. Farms J.V." USA St.

21

Undisputed Facts ¶ 29; Bank St. Undisputed Facts ¶ 15. *See also* USA Mt. Summ. Judg. Ex. K (Dkt. #63-12).

49. Carlton Farms also asserted liens against the Farm-Stored Rice and the proceeds derived therefrom, by virtue of a pre-petition lease agreement between itself and the Debtors. The terms of the lease and the basis for Carlton Farms's interest in the Farm-Stored Rice is set forth in Carlton Farms's Motion for Relief from Stay filed in the main bankruptcy case (Dkt. #39) and its Proof of Claim (Claim #11-1). Trustee St. Undisputed Facts ¶ 10.

50. The Trustee and Carlton Farms reached a settlement agreement, the terms of which are set forth in the *Application for Approval of Proposed Compromise Settlement Between Trustee and Carlton Farms, LLC* (4:12-ap-1044 Dkt. #33), *the Amended and Supplemental Application for Approval of Compromise Settlement Between Trustee and Carlton Farms, LLC* (4:12-bk-10768, Dkt. #158), and the Order granting same (4:12-ap-1044 Dkt. #65). In short, pursuant to the terms of the Agreement and Order, Carlton Farms transferred any and all interest it had in the rice owned by the Debtors and sold by the Trustee, making the Trustee the real party in interest for all claims of Carlton Farms against the Debtors' bankruptcy estate. Trustee St. Undisputed Facts ¶ 11.

51. The Trustee, as successor to Carlton Farms, asserts that it has a "super-priority" statutory landlord's lien, under Ark. Code Ann. § 18-41-101, on the Farm-Stored Rice proceeds for $52,159.25, the alleged unpaid portion of the "Landlord's

Share" due it under the Farm Lease.  USA St. Undisputed Facts ¶ 30; Bank St. Undisputed Facts ¶ 16.

52.    Section 4, entitled "Rent", of the Farm Lease executed by Carlton Farms and the Joint Venture clearly defines five separate terms, which are each underlined in the Farm Lease for emphasis: "Base Rent", "Landlord's Share", "Additional Rent", "Rent", and "Interest Rate."  USA St. Undisputed Facts ¶ 31; Bank St. Undisputed Facts ¶ 17.

53.    The first sentence of the "Rent" section of the Farm Lease states that "On or before March 1, 2011, Tenant shall pay to Landlord nonrefundable 'Base Rent' of $85.00 per tillable acre (a total of $211,327.00), which shall be credited toward the net share crop proceeds due to Landlord in accordance with this section."  USA St. Undisputed Facts ¶ 32; Bank St. Undisputed Facts ¶ 18.

54.    The Joint Venture has fully paid Carlton Farms the $211,327.00 "Base Rent" due under the Farm Lease.  USA St. Undisputed Facts ¶ 33; Bank St. Undisputed Facts ¶ 24.

55.    The second sentence of the "Rent" section of the Farm Lease states that the "Landlord shall have a net share interest in twenty six and one-half percent (26.5%) of all rice and twenty five percent (25%) of all other crops produced on the Premises ('Landlord's Share')."  USA St. Undisputed Facts ¶ 34; Bank St. Undisputed Facts ¶ 19.

56.    The second paragraph of the "Rent" section of the Farm Lease defined the term "Additional Rent" to mean "twenty-five percent (25%) of all insurance proceeds

23

paid under Tenant's crop loss insurance policy required under Section 14," and described the "Additional Rent" as "additional consideration for Landlord's lease of the Premises to the Tenant." USA St. Undisputed Facts ¶ 35; Bank St. Undisputed Facts ¶ 20.

57.     The second paragraph of the "Rent" section of the Farm Lease defined the term "Rent" by stating: "Additional Rent and Base Rent shall be collectively referred to as the 'Rent'." USA St. Undisputed Facts ¶ 36; Bank St. Undisputed Facts ¶ 21.

### ELF Check

58.     On January 26, 2012, ELF issued individual Debtor Dudley R. Webb, Jr. a check in the amount of $51,422.00 (the **"ELF Check"**). Trustee Mt. Summ. Judg. Exh. 7. ELF is a co-op style corporation formed for the single purpose of purchasing liquid fertilizer in bulk. ELF purchases the fertilizer for a lower rate, and each member/shareholder of the co-op can purchase the fertilizer from ELF. As an incentive for the bulk purchases, manufacturers of the fertilizer also regularly provide rebates to ELF's members at the end of the growing season. Debtor Dudley R. Webb, Jr. holds one hundred shares of ELF stock.[11]

59.     On February 13, 2012, the Bank wrote a letter to ELF claiming the rebate check was collateral on a loan it made to the Debtors, and requested the ELF Check be issued to it jointly. ELF complied, writing by hand the words "and Bank of England" in

---

[11] The Trustee contends the ELF Check was issued to Dudley R. Webb, Jr. as his share of manufacturer rebates by virtue of his individual shareholder or membership status in ELF. Trustee St. Undisputed Facts ¶ 15. The Bank contends that the ELF Check, as noted thereon, was for a "Rebate" related to funds previously loaned by the Bank to the Debtors and secured by the Bank's security interests. Bank St. Undisputed Facts ¶ 12.

the "pay to the order of" line on the ELF Check behind the Debtor's name, and deposited the funds with the Bank on February 13, 2012.  The Bank is still holding the funds from the ELF Check in a segregated account, claiming it as collateral.  Trustee St. Undisputed Facts ¶ 16; Trustee Mt. Summ. Judg. Exh. 8.

60.     No financing statement filed by the Bank listing either or both Debtors, or the Joint Venture, lists an interest in a security in or to the ELF Check.  Trustee St. Undisputed Facts ¶ 17.

## Settlement Check

61.     The Debtors deposited a check in the amount of $89,178.87 on January 13, 2012 (the **"Settlement Check"**).[12]  Bank St. Undisputed Facts ¶ 11.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, as applied to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted where the pleadings, depositions, answers to interrogatories, admissions or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Burnette v. Dow Chemical Company*, 849 F.2d 1269, 1273 (10th Cir. 1988).  "In determining whether a genuine question of material fact exists, this court is required to

---

[12] The Trustee asserts that the Settlement Check represents the Debtors' portion of a settlement in a class-action commercial tort claim involving genetically altered rice. The Bank states (as an undisputed fact) that the Settlement Check did not relate to a commercial tort claim but was payment for the loss or damage to the Debtors' farm crops pledged to the Bank.  Bank St. Undisputed Facts ¶ 11. The nature of this check is clearly in dispute as is discussed herein.

view the facts in [the] light most favorable to the nonmoving party . . . ." *In re Glider*, 225 B.R. 439, 448 (Bankr. E.D. Mo. 1998) (citation omitted).  Summary judgment is appropriate when a court can conclude that no reasonable juror could find for the nonmoving party on the basis of the evidence presented in the motion and response. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## ANALYSIS

### I. THE BANK'S AND USA'S SECURITY INTERESTS AND PERFECTED STATUS

The Trustee argues that the Bank and USA do not have legally enforceable liens against the Debtors' property because the Joint Venture could not grant a security interest in property owned by the individual debtors as a matter of law.  Alternatively, the Trustee contends that if a security interest was properly granted, neither the Bank nor the USA have perfected liens because their financing statements were seriously misleading and were filed in the wrong location.  If the liens were not perfected, the Trustee may avoid them pursuant to 11 U.S.C. § 544(a).[13]  However, if the USA's security interest in the

---

[13] Section 544(a) provides, in part:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
>
> . . .

This section allows the Trustee to avoid prepetition liens that were not perfected under state law

26

Warehouse Rice was properly granted by the Joint Venture on property owned by the individual Debtors, the Trustee concedes that the USA's security interest in the Warehouse Rice is properly perfected by the USA's possession of the warehouse receipts. *Brief in Support of Trustee's Response to [USA's] Motion for Summary Judgment*, p. 2 (Dkt. #99). The Bank concedes that the USA has priority over the Bank with respect to the Warehouse Rice and the Farm-Stored Rice. *Brief in Support of Bank of England's Motion for Summary Judgment*, p. 3 (Dkt. #108). The Bank also concedes that the USA has priority over it with respect to the equipment and vehicles for which the Bank did not obtain a purchase money security interest. *Id.* at p. 7-8 (referring to Dkt. #63-18).[14] Accordingly, the issues remaining to determine the USA's and Bank's status as secured creditors are whether the Joint Venture could grant a valid security interest in property it did not own, whether the Bank has a perfected security interest in the Warehouse Rice, the Farm-Stored Rice or the vehicles and equipment, and whether the USA has a perfected lien on the Farm-Stored Rice or vehicles and equipment. Finally, the Court must address a largely conceded issue concerning the parties' perfection in

---

before the Debtors' bankruptcy petition was filed. *See Shuster v. Doane*, 784 F.2d 883, 884 (8th Cir. 1986).

[14] Although the Bank does not dispute the USA's priority with respect to some of the vehicle and equipment proceeds, it argued in its Motion for Summary Judgment that the USA is under a duty to marshal its collateral and seek foreclosure of certain otherwise unencumbered real property located at 111 Andrew, Lonoke, Lonoke County, Arkansas, against which USA holds certain mortgage interests before seeking repayment from the vehicle and equipment proceeds. In its response to the Bank's Motion for Summary Judgment, the USA agrees to foreclose on the subject real estate thus resolving this issue.

certain titled vehicles (previously defined as the **"Vehicles"** in paragraph 14 of the Undisputed Facts).

### A.   Could the Joint Venture Grant a Security Interest in Debtors' Property?

The Trustee argues that the Joint Venture could not encumber property owned by the Debtors individually.  The Bank and USA assert that the Joint Venture may not be a separate legal entity but the Debtors could borrow money in the joint venture's name and grant a security interest in property they owned.[15]  The Court finds the Bank and USA are correct on this point, as explained below.

The Trustee maintains that the Joint Venture is not a legal entity, had no legal title to the property it attempted to encumber, and therefore could not have executed security agreements to the Bank and USA encumbering such property.  The Trustee relies on Ark. Code Ann. §§4-9-203[16] which governs the attachment and enforceability of security interests.  The Trustee claims that under this statute, a security interest does not attach

---

[15] The USA also maintains that the Trustee has already acknowledged that the USA's secured claim is valid because he made a docket entry (Dkt. #150) stating that all claims had been examined and found valid.  To state that all claims are valid is not the same as acknowledging that a claim is properly secured and perfected.  In bankruptcy, the term "claim" has broad meaning and encompasses both secured and unsecured claims.  *See generally* 11 U.S.C. § 101(5) (defining a claim, in part, as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

[16] The Trustee also cites Ark. Code Ann. §§4-9-503 and 509 which govern the filing of financing statements but are not relevant to whether the Joint Venture could grant a legally enforceable security interest in property it did not own.

28

to collateral not actually owned by the debtor/borrower,[17] and that if the Bank had any question about who the debtor/borrower was, it should have listed the Joint Venture as well as the individuals as debtors/borrowers on the security agreements.

According to the Arkansas Code, "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." Ark. Code Ann. § 4-9-201 (2014).  Further, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment."  Ark. Code Ann. §4-9-203(a) (2014).  In relevant part, Ark. Code Ann. § 4-9-203(b) provides that a security interest becomes enforceable against the debtor/borrower when value has been given, the debtor/borrower has rights in the collateral, and the debtor/borrower has authenticated a security agreement that provides a description of the collateral.

The question in this case is whether the Joint Venture had sufficient rights in the collateral to grant a valid security interest.  The Court's research did not reveal a case directly on point; however, several Arkansas cases shed light on when a debtor/borrower who does not own property in its own name has "rights in collateral" within the meaning of Ark. Code Ann. § 4-9-203(b).

In *Wawak v. Affiliated Food Stores, Inc.*, the Arkansas Supreme Court noted that the Arkansas Code does not define "rights in the collateral" and that the court had not yet

---

[17] Debtor in this sense refers to the borrower, not a debtor in bankruptcy, and therefore, the term "debtor/borrower" is used in this opinion (except in quoted material).

29

construed the term, but quoted an Idado court, which stated: "[p]ossession of the collateral, accompanied by a contingent right of ownership, has been held sufficient for a security interest to attach. . . . An interest greater than naked possession has been deemed a sufficient right in the collateral to satisfy the requirements of [similar] statutes." *Wawak v. Affiliated Food Stores, Inc.*, 306 Ark. 186, 188-90, 812 S.W.2d 679, 680-81 (1991) (quoting *First Security Bank of Idaho, N.A. v. Woolf*, 111 Idaho 680 (1986)) (internal citations omitted). In *Wawak*, the Wawaks operated a supermarket and made arrangements to sell it to another party, Davis. *Id.* at 680. Prior to completing the sale, Davis made immediate arrangements to purchase inventory for the supermarket from Affiliated Foods, with whom he executed a security agreement and financing statement covering the inventory of the supermarket. *Id.* Several months later, the transaction between the Wawaks and Davis was complete, and those parties entered into a security agreement and financing statement covering the inventory to secure the debt owed the Wawaks. *Id.* Later, Davis declared bankruptcy, and both the Wawaks and Affiliated Foods claimed priority in the inventory. *Id.* The court held Davis had more than "naked possession" when he executed a security agreement with Affiliated Foods as he was "effectively the buyer in possession of a going concern, fully empowered to convey title to the collateral to purchasers in the ordinary course of business," he was responsible for the profits and losses of the supermarket when he took possession and began operating it, and the final sale documents stated the sale became effective on a date prior to the date the sale was actually finalized. *Id.* Ultimately, the security interest of

30

Affiliated Foods was upheld as senior to the Wawaks' interest even though Davis, as the grantor of the security interest, did not own the collateral at the time he encumbered it. *Id.* at 681.

In *Hubbard v. HomeBank of Arkansas*, the Arkansas Court of Appeals was faced with a similar issue. In the year 2000, Simpkins made an oral contract for the sale of cattle and lease of a farm with Hubbard. 2011 Ark. App. 183, 382 S.W.3d 721, 726 (2011). Simpkins then paid a portion of the sales price and moved on the farm. *Id.* at 722. Later, in 2007, Simpkins borrowed money from HomeBank and granted the bank a security interest in the cattle he did not yet own, among other things. *Id.* In 2008, Hubbard sold the cattle and kept the proceeds, and Simpkins subsequently defaulted on the loan. *Id.* The lower court determined that Hubbard's unsecured interest was subordinate to that of HomeBank, and Hubbard appealed. *Id.* The Arkansas Court of Appeals affirmed, relying on *Wawak*, and held "[the facts in this case] demonstrate that Simpkins had more than mere possession of the collateral. He cared for and maintained the cattle for more than eight years pursuant to an oral sales contract, which established his 'rights in the collateral' sufficient for HomeBank to enforce its perfected security interest." *Id.* at 726.

The Arkansas Supreme Court's interpretation of the words "interest in collateral" in *Wawak,* supra, was partially derived from a Supreme Court of Oklahoma case *Morton Booth Co. v. Tiara Furniture, Inc.*, 1977 OK 45, 564 P.2d 210, 214 (1977). In that case,

Tiara had a contract with Booth for the manufacture and sale of gun cabinets, where Booth supplied most of the materials for making the cabinets, and Tiara supplied the lumber and labor to construct the cabinets. *Id.* at 211. Tiara would complete the cabinets and mail them to Booth at a reduced price. *Id.* The trial court found that the legal effect of the shipment of goods to Tiara was a sale, but the appellate court reversed. *Id.* at 212. The Supreme Court affirmed the trial court, holding:

> [W]here a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach . . . Tiara had substantial rights in the materials supplied by Booth other than mere possession. Primary among Tiara's rights was the right to incorporate the materials into a product for sale. The purpose behind Booth's contract to provide the goods was to control the cost and quality of the finished product. Under the contract Tiara had the right to use the materials provided in the manufacture of gun cabinets, and sell the finished product to Booth. Also, Tiara had substantial legal rights in the goods in its possession. Tiara had a security interest of its own in the materials Booth provided and in Tiara's possession for the payment of accounts due under the contract to manufacture and sell the gun cabinets. The right of a debtor to enforce a security interest in his favor over goods in the debtor's possession has been held to be sufficient rights in the collateral to allow a creditor's security interest to attach.

*Morton Booth Co. v. Tiara Furniture, Inc.*, 1977 OK 45, 564 P.2d 210, 214 (1977) (citations omitted).

The Eighth Circuit of Appeals distinguished *Morton* from a case where a true bailment occurred in *Rohweder v. Aberdeen Production Credit Ass'n*, 765 F.2d 109, 112 (1985). A bailment is "[a] delivery of goods by one person (the bailor) to another (the bailee) who holds the property for a certain purpose under an express or implied-in-fact

contract . . . a bailment involves a change in possession but not title." *Black's Law Dictionary, 8th Ed.*, pp. 151-152.  The court stated that in *Morton*, a sale occurred, and not a bailment. *Rohweder,* 765 F.2d at 112.  In *Rohweder*, Rohweder and Bellman entered into an agreement where Bellman would breed his bulls with Rohweder's cows, pasture and care for all the cows and calves, and receive 40% of the calf crop, while Rohweder remained owner of his cows and received the rest of the calves.  *Id.* at 110.  Pursuant to the agreement, Bellman also had an option to purchase Rohweder's cows at any time during the coming year.  *Id.*  Bellman had previously executed a security agreement with the credit association for any "after-acquired livestock," subsequently defaulted and filed for bankruptcy, and the association seized and sold all of the cattle, including Rohweder's.  *Id.* at 111.  The court held that this was a true bailment and that mere possession of the collateral does not give the debtor/borrower sufficient rights for a security interest to attach.  *Id.* at 112.

The U.S. Bankruptcy Court in North Dakota considered both *Morton* and *Rohweder* when determining whether a debtor/borrower had sufficient rights in collateral owned by his brother.  The court found that intent was a crucial element in determining whether the holder of another's property had sufficient rights and that the debtor/borrower in that case only had authority to sell and not buy collateral for his brother.  *In re Cook*, 63 B.R. 789, 797-798 (1986).  The bankruptcy court stated that *Rohweder* did not give clear guidelines as to what constitutes "sufficient rights," and it

33

believed "a debtor possesses sufficient rights . . . if the true owner agrees to the debtor's use of the property as security or if the true owner is estopped to deny creation of the security interest." *Id.* at 798 (citations omitted). Ultimately, the court did not find that the debtor/borrower had sufficient rights to encumber the property. *Id.*

In this case, several of the security agreements designate some form of "Dudley R. Webb, Joint Venture" as the debtor/borrower, and they are signed either by some combination of Dudley and Peggy Webb, or something similar to "Dudley Webb, Partner." *See* Dkt. #63, Ex. E, H, K, N; Dkt. #106, Ex. C; Dkt. #118 p. 17. Previously, the Court found that the Joint Venture was not a partnership but was simply an agreement between the parties on how they would conduct business with each other. The Trustee argues that the Joint Venture should not have been the debtor/borrower listed on these agreements, did not have sufficient "rights in the collateral" to encumber the property, and thus, these agreements should be ineffective or invalid.

While much of the caselaw described above involved facts with a "contingent right of ownership," this is not that type of case. There is not a separate entity here pledging the assets of another; it is simply two individuals conducting their business as a joint venture and pledging their own assets to obtain funds to conduct that business. Because this case does not involve a contingent right of ownership as in the Arkansas cases discussed herein, the Court looks to *Wawak*'s emphasis on the debtor/borrower having more than "naked possession" of the collateral as well as the other factors relied on by Arkansas courts such as: who had possession of the collateral, who cared for and

34

maintained the collateral, and who was entitled to profit and loss relative to the collateral. There is little distinction between the Joint Venture and the individual Debtors in this case, but as the Debtors' farming operation was conducted in the name of the Joint Venture, the Court finds that the Joint Venture had more than naked possession of the equipment serving as collateral for the Bank's and USA's loans, and the Joint Venture utilized the equipment for the benefit of the farming operation, profited from its use, and was presumably responsible for its upkeep and maintenance. Furthermore, collateral like the rice was obtained through the farming activities of the Joint Venture (and did not previously exist) and there is no evidence the rice was owned by the Debtors in any individual capacity separate and distinct from the individuals' interest in the Joint Venture (which this Court has already found not to be a separate entity). Even if the Joint Venture can be viewed separately from the Debtors in this case, the Court finds that it would have sufficient rights in the collateral under Arkansas law to grant security interests in both the rice and equipment at issue.

Furthermore, Dudley and Peggy Webb directly benefitted from the activities of the Joint Venture (which this Court found are one and the same). This is similar to the *Morton* case in that the Webbs provided equipment to the Joint Venture and reaped profit from the joint venture's activities. While *Rohweder* makes it clear that a bailment does not qualify as sufficient rights in collateral, *In re Cook* went further than *Rohweder,* and the court there found that if the true owner agrees to the property being used as security,

35

the debtor/borrower would possess sufficient "rights in the collateral." In this case, one or both of the Debtors signed all of the security agreements and agreed to the Joint Venture encumbering the property. Additionally, this Court specifically found that the Joint Venture is not a separate legal entity but a contractual relationship between the Debtors. *See also Newsom v. Rabo Agrifinance, Inc.*, 2013 Ark. App. 259, 427 S.W.3d 688, 691 (2013) (although not specifically addressing "rights in collateral", the Court held that a lender's lien was not invalid even though an entity with no express title to the crops was able to encumber the crops based on another borrower's interest in the crops).

In conclusion, the Court finds that the Joint Venture had more than naked possession of the encumbered property listed in the security agreements with the Bank and USA, that the Debtors consented to the Joint Venture encumbering the property, and that accordingly, the Joint Venture had sufficient "rights in the collateral" within the meaning of Ark. Code Ann. § 4-9-203 to grant valid security interests to the Bank and USA. Accordingly, the Bank and the USA have legally enforceable security interests and the next question is whether those security interests were perfected under state law. The Trustee raises two perfection issues: whether the name used was seriously misleading and whether the financing statements were filed in the proper location.

### B.   <u>Were the Financing Statements Seriously Misleading?</u>

The Court has determined the security agreements executed by the Debtors on behalf of the Joint Venture are not invalid solely because they were executed by the

36

Debtors on behalf of the Joint Venture. The Court must next determine whether the financing statements filed by the USA and the Bank which listed the debtor/borrower as the Joint Venture are effective to perfect the USA's and Bank's security interests. Both the Bank and the USA filed financing statements in either the individual Debtors' names or in the Joint Venture's name. The Trustee challenges those financing statements which list the Joint Venture as the debtor/borrower as being seriously misleading and therefore ineffective under Ark. Code Ann. § 4-9-506(a)-(b).[18] If a financing statement is seriously misleading, then the creditor's security interest is not perfected and subject to avoidance in bankruptcy pursuant to 11 U.S.C. § 544(a).

When executing a security agreement, a debtor authorizes the filing of a financing statement against him covering the collateral described in the agreement. *See* Ark. Code Ann. § 4-9-509(b). With respect to the sufficiency of a financing statement filed to perfect a secured debt, Ark. Code Ann. § 4-9-502(a) provides that:

> (a) Subject to subsection (b) [regarding real-property related filings], a financing statement is sufficient only if it:

---

[18] Ark. Code Ann. § 4-9-506 (2001) provides, in part:

> (a) A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading.

> (b) Except as otherwise provided in subsection (c), a financing statement that fails sufficiently to provide the name of the debtor in accordance with § 4-9-503(a) is seriously misleading.

(1) provides the name of the debtor;

(2) provides the name of the secured party or a representative of the secured party; and

(3) indicates the collateral covered by the financing statement.

A financing statement sufficiently provides the name of the debtor "if the debtor is a registered organization, only if the financing statement provides the name of the debtor indicated on the public record of the debtor's jurisdiction of organization which shows the debtor to have been organized", Ark. Code Ann. § 4-9-503(a)(1) (2001), or if the debtor is not a registered organization but has a name, the financing statement must provide the individual or organizational name of the debtor.   Ark. Code Ann. § 4-9-503(a)(4)(A) (2001).[19]

The UCC defines a "registered organization" as "an organization organized solely under the law of a single State or the United States and as to which the State or the United States must maintain a public record showing the organization to have been organized."   Ark. Code Ann. § 4-9-102(a)(71) (2001).   If the debtor does not have a name, then it must provide "the names of the partners, members, associates, or other persons comprising the debtor."   *See* Ark. Code Ann. § 4-9-503(a)(4)(B).   Further, "[a] financing statement that provides only the debtor's trade name does not sufficiently provide the name of the debtor."   Ark. Code Ann. § 4-9-503(c).

---

[19] The Arkansas legislature recently adopted the 2010 Amendments to Article 9 proposed by the National Conference of Commissioners on Uniform State Laws (**"NCCUSL"**).   *See* 2013 Ark. Acts 138 (eff. July 1, 2013).   The events in this case took place in 2011, before the 2010 amendments became effective.

Most sources treat the name of a joint venture as any other unregistered "organizational name" under § 4-9-503(a)(3)(A) such that the individual names of the persons comprising the debtor under § 4-9-503(a)(3)(B) are not required. *See, e.g.*, Terry M. Anderson et al., Attachment and Perfection of Security Interests under Revised Article 9: A "Nuts and Bolts" Primer, 9 AM. BANKR. INST. L. REV. 179, 211 (2001) ("If the debtor is an organization but is not registered, the general rule of section 9-307(b) will locate the debtor for filing purposes at the debtor's place of business, or its chief executive office if it has more than one place of business. This rule will govern filings against general partnerships and joint ventures, for example."); Charles Cheatham, Changes in Filing Procedures under Revised Article 9, 25 OKLA. CITY U. L. REV. 235, 243 (2000) ("General partnerships and joint ventures, which are formed under common law and require no formal approval from a state, are 'organizations.'"). *But see* William E. Carroll & Alvin C. Harrell, Article 9 Filings: Russian Roulette-UCC Style, 52 CONSUMER FIN. L.Q. REP. 338, 347 (1998) ("[Revised] [s]ubsection 9-503(a)(4)(B) similarly provides specific guidance regarding such debtors as unincorporated associations and unregistered joint ventures."). *See also United States v. Merchants & Marine Bank*, 292 So. 2d 151, 153 (Miss. 1974) (listing one co-venturer is insufficient because the financing statement would fail to alert a potential creditor that a joint venture is in existence). A joint venture is also considered an "Organization" under the general definitions of the Arkansas UCC. *See* Ark. Code Ann. §§ 4-1-201(b)(25) (2007)

39

("'Organization' means a person other than an individual."), (27) ("'Person' means an individual, . . . association, joint venture, . . . or any other legal or commercial entity."). The general definitions were last amended in 2007 and all of the financing statements listing the Joint Venture were filed after that date.

The filing and maintenance of a public record is not required to form a joint venture in Arkansas because "a joint venture is a relationship founded entirely upon contract . . . .'" *Webb*, 742 F.3d at 828 (quoting *Slaton v. Jones*, 88 Ark. App. 140, 195 S.W.3d 392, 397 (2004)). Consequently, the UCC name rules governing unregistered organizations apply, and accordingly, the financing statement sufficiently provides the name of the debtor if it provides either the debtor's individual name or organizational name. *See* Ark. Code Ann. § 4-9-503(a)(4)(A). The Court concludes that a joint venture is considered an unregistered organization and the "organizational name" is sufficient under § 4-9-503(a)(3)(A) and the use of the name "Dudley R. Webb, Jr. Farms Joint Venture" as opposed to the individual names of the Debtors, Dudley and Peggy Webb, is not seriously misleading.[20] Accordingly, the USA's and Bank's security interests are

---

[20] If the individual names should have been used instead of the Joint Venture, then the next step is to determine if the financing statements would have been found anyway. "If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic" would disclose the financing statement with the incorrect name of the debtor, then the financing statement is not seriously misleading. *See* Ark. Code Ann. § 4-9-506(c). It is irrelevant if the correct name of the debtor appears somewhere in the string of words listed as the debtor's name; the financing statement must be found using the debtor's correct name under the search logic. *Hastings State Bank v. Stalnaker (In re EDM Corp.)*, 431 B.R. 459, 467-68 (B.A.P. 8th Cir. 2010). The search logic of the Pulaski County Circuit Clerk's Office and the Lonoke County Circuit Clerk's Office would determine whether someone entering the names of the debtors would reveal the name "Dudley R. Webb Jr. Farms JV." The

perfected despite their use of the Joint Venture name on some of their financing statements.

## C.   **Were the Financing Statements Filed in Proper Location?**

The Court next considers whether the financing statements covering crops and/or equipment (excluding the Vehicles which required perfection by notation of a lien on the title) were filed in the proper location.  The USA's financing statements were all filed between 2000 and 2011 in Lonoke County where the Debtors engaged in farming activities.  The Bank filed many financing statements with both the Secretary of State and Lonoke County Circuit Court between 2002 and 2012 covering various types of collateral; some generally covered farm products and/or equipment; some covered only specific items of equipment.[20]  Because the Trustee's position is that the financing

---

Trustee contends he searched the Secretary of State's filings using the individual debtors' names and did not find the USA's financing statements.  The USA responds that the Trustee conducted his search in the wrong location because the USA's financing statements were appropriately filed in the county pursuant to Ark. Code. Ann. § 4-9-501.  The USA is correct on this point; its financing statements filed in the Debtors' individual names were correctly filed in Lonoke County as opposed to the Secretary of State's office, which is discussed in more detail below.

[21] "Farm products" are defined, in relevant part, as
> . . . goods, other than standing timber, with respect to which the debtor is engaged in a farming operation and which are:
>> (A) crops grown, growing, or to be grown, including:
>>> (i) crops produced on trees, vines, and bushes; and
>> . . .
>> (C) supplies used or produced in a farming operation; or
>> (D) products of crops or livestock in their unmanufactured states.

Ark. Code Ann. § 4-9-102 (both current and prior versions use this definition).

statements filed in the name of the Joint Venture are ineffective as seriously misleading, he looks solely to those financing statements filed in the names of the individual debtors and concludes that those were not filed in the proper location – they were either filed in the county when they should have been filed with the Secretary of State or vice versa. The Trustee does not argue any financing statements were filed in the wrong county (such as Pulaski instead of Lonoke and vice versa).[22]   Accordingly, the Court applies the UCC requirements for filing financing statements covering crops and farm equipment to those financing statements filed in the Debtors' individual names and in the name of the Joint Venture (since the Court has found those are not seriously misleading) to determine if the financing statements were filed in the proper location.

-------

[22] A debtor-individual is "located" at the individual's "principal residence." § 4-9-501(b)(1).  A debtor-organization is located at its "place of business" when it only has one place of business. § 4-9-501(b)(2). "Place of business" is not defined by the Code. The Eighth Circuit Court of Appeals has said that determining where the debtor's place of business is involves "a finding based on a non-technical statutory standard closely related to practical human experience." *In re Curtis*, 363 B.R. 572, 579 (Bankr. E.D. Ark. 2007) (quoting *Am. Cyanamid v. McCrary's Farm Supply, Inc. (In re McCrary's Farm Supply, Inc.)*, 705 F.2d 330, 332 (8th Cir. 1983)). Under this test, each county where the debtor grows crops constitutes a "place of business." *Id.*

If the debtor-organization has more than one place of business, then the debtor is located at its "chief executive office." Ark. Code Ann. § 4-9-307(b)(3) (2011). "Chief executive office" is also not defined by the Code, but Official Comment 2 states that this "means the place from which the debtor manages the main part of its business operations or other affairs. This is the place where persons dealing with the debtor would normally look for credit information, and is the appropriate place for filing." *Curtis*, 363 at 579 (looking to comment definition). Applying this definition, Courts have looked to the address listed on the debtor's balance sheets, tax returns, loan documents, security agreements, as well as where the individuals of organization reside. *See id.* at 580.

In this case, the county in which creditors filed did not matter because the Bank is properly perfected with the Secretary of State based on its financing statements filed under the name of the Joint Venture, and the USA is properly perfected because it filed in both Pulaski and Lonoke Counties in the name of the Joint Venture.

Given the facts of this case, determining whether the creditors' financing statements were filed in the proper location is complex. The statutes have been amended during the course of the creditors' relationship with the Debtors; accordingly, various versions of the UCC control whether a financing statement was filed in the proper location at a given time. The appropriate filing location also depends on the type of creditor and the type of collateral. Under the current version of Ark. Code Ann. § 4-9-501, to perfect a security interest or agricultural lien, a financing statement must be filed with the Secretary of State unless the collateral is as-extracted collateral or timber to be cut. Ark. Code Ann. § 4-9-501(a)(3) (2010). From July 1, 2001 through January 1, 2010, security interests in collateral consisting of equipment used in farming operations, or farm products, or accounts arising from the sale of farm products were perfected by filing a financing statement with the office of the circuit clerk in the county in which the debtor engaged in farming is located. *See* Ark. Code Ann. § 4-9-501(a)(2) (2001). This filing requirement continued through midnight, December 31, 2012, for collateral that was a farm-stored commodity financed by a loan through the USDA-CCC. *See* Ark. Code Ann. § 4-9-501(a)(2) (2010). Prior to July 1, 2001, security interests in farm products or equipment used in farming were perfected by filing in the appropriate county circuit clerk's office. *See* Ark. Code. Ann. § 4-9-401 (2001).[23]   Accordingly, financing

---

[23] Specifically, Ark. Code Ann. § 4-9-401 provided, in relevant part:
(1) The proper place to file in order to perfect a security interest is as follows:
  (a) When the collateral is equipment used in farming operations, or farm products, or accounts or general in-tangibles arising from or relating to the sale of

43

statements covering crops or farm equipment were required to be filed with the county where the debtor/borrower farmed until 2010 (or December 31, 2012 if the collateral was a farm-stored commodity, and the creditor was the USDA-CCC); since then, financing statements covering crops or equipment must be filed with the Secretary of State.

In this case, the 2011 financing statements were filed by the USDA-CCC in both Pulaski and Lonoke counties and covered all 2011 crops. Because the USDA-CCC had until midnight, December 31, 2012, to file its financing statements in the counties where the Debtors/Joint Venture farmed, and that is where the USA filed, its security interests in the 2011 crops were properly perfected. Additionally, the USA's financing statement filed in Lonoke County in 2000 and continued in 2004 and 2009 in the Debtors' individual names covered all crops and equipment. In the related security agreement, the Debtors, in their individual capacities, granted the USA a security interest in over one hundred pieces of equipment to secure "all existing and future indebtedness." USA Mt. Summ. Judg. Exh. N. (Dkt. #63-14, p. 1). Accordingly, because the USA filed its financing statement covering the Debtors' equipment in Lonoke County where they lived and farmed, and that was the appropriate place for the USA to file both in 2000 and when

---

farm products by a farmer, or consumer goods, then in the office of the clerk of the circuit court and ex officio recorder in the county of the debtor's residence or if the debtor is not a resident of this state then in the office of the clerk of the circuit court and ex officio recorder in the county where the goods are kept, and in addition when the collateral is crops growing or to be grown, in the office of the clerk of the circuit court and ex officio recorder in the county where the land is located;

. . .

the continuations were filed, the USA is properly perfected in the equipment sold by the Trustee (excluding the Vehicles discussed below).[24]

The Bank's security interest in the rice is also properly perfected. Through January 1, 2010, the Bank's financing statements should have been filed in the appropriate county. In 2002, the Bank filed a financing statement covering farm products in Lonoke County. *See* Exhibit 1-D to *Bank of England's Response to Trustee's Motion for Partial Summary Judgment* (Dkt. #120-1, p. 9-10).[25] From 2010 on, the Secretary of State's office was the appropriate place for filing. The Bank filed financing statements covering farm products with the Secretary of State on January 31, 2011 (Dkt. #106-4, p. 18), and on March 2, 2011 (Dkt. #106-4, p. 20).[26] This financing statement clearly covered the

---

[24] Additionally, the Trustee concedes that the USA is most likely properly perfected with respect to its liens on the Debtors' equipment as to any items for which a notation on a certificate of title is not required. *Brief in Support of Trustee's Response to [USA's] Motion for Summary Judgment*, pp. 3, 12 (Dkt. #99).

[25] In his reply to this pleading, the Trustee asserted that this particular financing statement (No. 85319) had never been produced; it was attached to the Affidavit of Joey Adams which was an exhibit to the Bank's response to the Trustee's Motion for Partial Summary Judgment.

[26] With respect to the financing statements filed in the Debtors' individual names, the Trustee raises the question of whether a financing statement that has not lapsed and was properly filed in the local county under the pre-2010 amendments is now rendered invalid because it would need to be filed in the Secretary of State's office under the amendments. The short answer is no.

Part 8 of the 2010 amendments contain a host of transitional provisions for pre-amendment security interests. The general rule is that a security interest that is properly perfected before the 2009 amendments go into effect remains perfected. *See* Ark. Code Ann. § 4-9-803(a) (2013). The 2010 amendments did however alter the rules for filing a continuation statement, which is required to remain perfected under the UCC. Notably, if the financing statement originally filed against debtor relates to collateral that is not "a farm-stored commodity financed by a loan through the Commodity Credit Corporation of the United States Department

45

2011 rice crop, and accordingly the Bank's security interest in both the Warehouse and Farm-Stored Rice is perfected.

The perfection of the Bank's security interests in the equipment is more difficult to determine but the Court concludes the Bank is also perfected as to the equipment (excluding the Vehicles discussed below). With one exception, all the Bank's security agreements secured all existing and future debts. The Bank filed numerous financing statements covering equipment between 2002 and 2012 with the Secretary of State's office; however, between 2001 and 2010, the Bank should have filed financing statements in the appropriate county, not the Secretary of State's office. The Bank's 2002 financing statement filed in Lonoke County did not cover equipment. In 2004, the Bank filed a financing statement covering equipment, including a specific list of items, in Lonoke County. In 2008, the Bank filed a financing statement in Lonoke County covering specific items of equipment.[27] Finally, in 2011, the Bank appropriately filed financing statements with the Secretary of State's office which broadly covered all

---

of Agriculture," then filing a continuation statement with the county circuit clerk is "ineffective." Ark. Code Ann. § 4-9-510(d)(1). Instead, the secured party is to file the continuation statement with the Secretary of State to remain perfected. Ark. Code Ann. § 4-9-510 (d)(3).

[27] This financing statement is stamped "paid for termination". No argument was made that the financing statement is in fact terminated. The USA explained in its pleadings that the stamp "PAID FOR TERMINATION" represents an upfront payment by the creditor made at the time the financing statement was filed, to cover the fee that will be charged by the circuit clerk's office when USDA-CCC informs the clerk's office that the lien has been satisfied and requests that the UCC filing be terminated.

equipment.[28]  The Court finds the Bank's 2004 financing statement most likely perfected the Bank's security interest in all of the Debtor's equipment, but even if it were construed to only perfect an interest in the specific items of equipment listed, the Bank's 2011 financing statement appropriately filed with the Secretary of State's office perfected the Bank's security interest in the equipment ultimately sold by the Trustee.

### D.   <u>Perfection of Security Interests in Vehicles.</u>

Although the USA and Bank have perfected security interests in the equipment sold by the Trustee, the Trustee identified ten vehicles with no lien appearing on a certificate of title as required for perfection pursuant to Ark. Code Ann. § 27-41-801 *et seq*.  The Vehicles sold for $34,875.  The USA concedes its liens are not on these certificates of title, and that it is not perfected as to the Vehicles.  The Bank concedes its liens are not on the certificates of title which the Trustee has produced but asserts that the Trustee should not be granted summary judgment as to the two trailers for which a title has not been produced.  The Bank further asserts that there could be an issue of fact as to whether these are vehicles required to be registered as motor vehicles, and that without

---

[28] The Trustee also concedes that the Bank is most likely perfected with respect to the equipment for which no title is required provided both Debtors are listed on the financing statement.  *See Brief in Support of Trustee's Response to Bank of England's Motion for Summary Judgment,* p. 7 (Dkt. #118); *Brief in Support of Trustee's Motion for Partial Summary Judgment*, p. 5 (Dkt. #105).  The Court does not need to examine whether both Debtors must be listed on the financing statement because there were only two financing statements listing only Debtor Dudley Webb and both of those were incorrectly filed with the Secretary of State's office.

the certificates of title, the Trustee has failed to establish that there are no liens on the two trailers and that he is therefore entitled to avoid the liens on these Vehicles and keep the proceeds for the benefit of the Debtors' bankruptcy estate.

Liens on registered vehicles must be recorded on the vehicle's certificate of title in order for a creditor to have a perfected security interest in a vehicle. *See* Ark. Code Ann. § 27-14-807 ("The methods provided in this subchapter of giving constructive notice of a lien or encumbrance upon a registered vehicle shall be exclusive except as to liens dependent upon possession and manufactured homes or mobile homes for which the certificate of title has been cancelled under § 27-14-1603."); Ark. Code Ann. § 4-9-311(a) ("Except as otherwise provided in subsection (d), the filing of a financing statement is not necessary or effective to perfect a security interest in property subject to: . . . (2) any other laws of this State which provide for central filing of security interests or which require indication on a certificate of title to property of such interest, including but not limited to §§ 27-14-801 – 27-14-807 . . .". *See also In re Renaud*, 308 B.R. 347 (B.A.P. 8th Cir. 2004).

Again, the USA and Bank both concede they do not have perfected security interests in those Vehicles with titles that do not list their liens. The Bank, however, asserts that the Trustee has not shown that the two trailers for which the title has not been produced are vehicles required to be registered under Arkansas law. The Trustee responds that there can be no dispute that the trailers are vehicles pursuant to Ark. Code

48

Ann. § 27-14-207(8) which provides that "'Vehicle' means every device in, upon, or by which any person or property is, or may be, transported or drawn upon a highway, excepting devices moved by human power or used exclusively upon stationary rails or tracks." The Court finds there is no material issue of fact with respect to whether these two trailers are vehicles for which a lien must have been recorded on a title to perfect a security interest. The parties do not dispute that these were in fact trailers or that trailers can transport property on a highway. Further, the Trustee submitted reports showing that titles had been issued for these items. The Bank's argument that the Trustee failed to meet his burden of proof because he did not produce titles to the two trailers in question is without merit. The Bank is arguing that the Trustee must prove a negative – that the Bank does not have a lien – when the Bankruptcy Rules specifically require a secured creditor to prove its secured status. Pursuant to Rule 3001(d) a creditor must attach to its proof of claim evidence of the perfection of its security interest. *See In re Immerfall*, 216 B.R. 269, 272 (Bankr. D. Minn. 1998) ("Fed. R. Bankr. P. 3001(c) . . . imposes the procedural burden of producing documentary proof of secured status on any creditor that asserts such, when it proves up its claim pursuant to 11 U.S.C. § 501(a) and Fed. R. Bankr. P. 3001."). Accordingly, the Bank was required to show it had a perfected security interest by providing some proof that its lien was recorded on the trailers at issue (even if the original title cannot be located); the Trustee is not required to prove that the Bank did not have its lien recorded.

Because the USA and Bank have no recorded liens on certificates of title to the Vehicles sold by the Trustee, summary judgment is granted in favor of the Trustee; the Trustee may avoid the USA's and Bank's liens on the proceeds from the sale of the Vehicles in the amount of $34,875.[29]

## II.   CARLTON FARMS'S LANDLORD SHARE OF THE FARM-STORED RICE.

Pursuant to a settlement between the Trustee and Carlton Farms, the Trustee stands in Carlton Farms's shoes with respect to Carlton Farms's rights under a lease agreement with the Debtors.  At issue is the Landlord's Share in the amount of $52,159.25 provided for under section 4 of the Lease Agreement under the heading "rent".  The Trustee argues the Landlord's Share is rent entitled to priority under Ark. Code Ann. § 18-41-101 which provides for a super-priority landlord's lien "upon the crop grown upon the demised premises in any year for rent that shall accrue for the year."  The Trustee also points out that he may avoid the fixing of the statutory lien pursuant to 11 U.S.C. § 545.  Alternatively, in the event the Court finds the Landlord's Share is not rent, the Trustee argues that the Landlord's Share belonged to Carlton Farms as its share of the Debtor's crop, and is accordingly, not property of the Debtor's estate.  The Bank and USA argue that there is no landlord's lien because the Landlord's Share is not rent under the definition of rent in the Lease Agreement, and all rent due Carlton Farms was already

---

[29] The Bank also argues the Trustee should deduct the costs associated with the sale of the Vehicles against the sale proceeds in the event its liens are avoided.  The Bank does not develop this argument.  The Vehicle proceeds belong to the estate and the sale costs are administrative expenses in any case.

paid.

The terms of the lease are undisputed. The "Landlord's Share" is provided for under the section of the lease entitled "rent". The "Base Rent" is a dollar amount that is then offset against the "Landlord's Share" of the crop in determining the total compensation due the landowner for the Debtors' use of its property for farming. There is a sentence in that section which states: "'Additional Rent' and 'Base rent' shall be collectively referred to as the 'Rent'."[30] The Court finds that this definition of the term "rent" simply distinguishes monetary rent from the Landlord's compensation in the form of a percentage interest in the crops grown and sold; this sentence does not change the nature of the agreement which provides compensation to the landowner for the Debtors' use of the property, a relationship which qualifies as rent in the legal sense. As pointed out by the Trustee, Black's Law Dictionary defines "rent" as "[c]onsideration paid, usually periodically, for the use or occupancy of property." Black's Law Dictionary, 611 (3d pocket ed. 2006). Accordingly, the Court finds that the Landlord's Share is rent under the lease agreement, and the Trustee is granted summary judgment as to this issue.

## III.   SURCHARGE.

The Trustee seeks to surcharge the collateral securing the debts owed to the Bank and USA on a pro rata basis pursuant to 11 U.S.C. § 506(c) for his costs associated with

---

[30] The IRS considers crop shares rent. *See* Publication 225 ("You must include rent you receive in the form of crop shares in income in the year you convert the shares to money or the equivalent of money.")

the disposition of the collateral, including a broker fee, attorneys' fees related to such dispositions, and maximum compensation permitted by 11 U.S.C. § 326. Trustee Ans. and Counterclaim (Dkt. #24), p. 17-18. The Trustee specifically seeks to surcharge the collateral for attorneys' fees and expenses, and Trustee's fees and expenses in relation to the necessity of bringing the temporary restraining order action against the Bank so that he could properly and reasonably dispose of the bankruptcy estate's property, as well as for the actual collection and disposition of the rice and the equipment, including all expenses incurred in the sale of same. Trustee Ans. and Counterclaim at ¶¶ 139-141.

The parties all agree on the applicable law which was thoroughly set forth in the USA's Brief in Support of its Motion for Summary Judgment. Section 506(c), states that:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). "It is well-settled that, in order to recover under § 506(c), the trustee must show three elements: (1) that the expenditure was necessary; (2) that the expenditure was reasonable; and (3) that the secured creditor received a benefit from the expenditure." Bankruptcy Law Manual § 6:50 (5th ed.); *see also Brookfield Production Credit Ass'n v. Borron*, 738 F2d 951, 952 (8th Cir. 1984) (quoting and adopting the district court's opinion, 36 B.R. 445, 448 (E.D. Mo. 1983). The Trustee has the burden of proving a relevant showing for the basis of a surcharge. *See Halverson v. Estate of*

52

*Cameron (In re Mathiason)*, 16 F.3d 234, 240 (8th Cir. 1994); *see also In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001) ("This is not an easy standard to meet. It is the party seeking the surcharge that has the burden of showing a 'concrete' and 'quantifiable' benefit. The § 506 recovery is limited to the amount of the benefit actually proven.").

"Where a secured creditor consents to the surcharge of collateral, the trustee need not show necessity, reasonableness, or benefit to the secured party in order to recover the expense." Bankruptcy Law Manual § 6:50 (5th ed.). A creditor's mere cooperation or agreement to allow the trustee to sell collateral is not sufficient to warrant a finding of consent. *See id.; see also In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 77 (2d Cir. 1984); *Hartford Fire Ins. Co. v. Norwest Bank Minnesota, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 175 n. 6 (8th Cir. B.A.P. 1998) ("Inferences of consent must not be hastily drawn. . . . 'Mere cooperation with the [Chapter 11] debtor does not make the secured creditor liable for all expenses of administration.'") (quoting *Central Bank of Mont. v. Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.)*, 815 F.2d 546 (9th Cir.1987)). However, where a creditor causes expenses to be incurred, consent may be inferred. *See In re Felt Mfg. Co., Inc.*, 402 B.R. 502, 527 (Bankr. D.N.H. 2009) ("Implied consent in these circumstances is generally limited to when the secured creditor caused the expense.") (citing *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985); *In re Roberts*, 249 B.R. 152, 158 (Bankr. W.D. Mich. 2000)).

The parties' arguments focus on benefit to the secured creditors and their consent. The USA argues that it did not consent to the surcharge of its claims just because it did not object to the Trustee selling its collateral. The Bank also argues it did not consent to the expenses or a surcharge, but the Trustee argues the Bank caused the expenses and therefore consented by implication. The Court finds that the Trustee's ability to surcharge collateral is fact-driven, and the Court has insufficient facts on which to rule on the surcharge issue at this time.[31] Although it would appear that certain costs and expenses associated with promptly selling the collateral were both reasonable and necessary as well as beneficial to the secured creditors, the Court needs additional evidence of the benefit conferred upon the secured creditors that would support a claim for surcharge, and evidence of the extent to which the USA consented to or the Bank caused such expenses.[32] For these reasons, the issue of surcharge is reserved for trial.

---

[31] For purposes of appeal, "[t]he determination of whether surcharge of collateral under § 506(c) is appropriate is in the discretion of the bankruptcy court and involves a question of fact which is reversible only if clearly erroneous." Bankruptcy Law Manual § 6:50 (5th ed.).

[32] As the caselaw cited indicates, the standard necessary to surcharge collateral is a difficult one to meet. The Court recognizes the hurdles inherent in proving a claim for surcharge but notes that the Bank's behavior in this case undoubtedly increased administrative expenses, and under these facts, these increased unnecessary expenses caused by the Bank penalize the unsecured creditors. As the Court previously stated in its August 21, 2014 Order approving the fees and expenses of the Trustee and his counsel (Dkt. #242),

> [W]here a litigant has ignored a pretrial discovery court order, presents arguments in its objections to fees based on its version of contested facts (asserting that it is a secured, perfected creditor) when such assertions are the subject of pending motions for summary judgment involving multiple complex legal issues, and where a litigant has misrepresented prior court rulings in signed pleadings, the Court is left with the distinct impression that the objections to the fee application are not in good faith but represent an effort on the part of the Bank to stretch the

IV.    <u>POST-PETITION TRANSFER OF ELF CHECK.</u>

On January 26, 2012, ELF issued a check for $51,422 made out to Dudley Webb;
the check stub indicates it is a "rebate."  Trustee Mt. Summ. Judg. Exh. 7.  On February
13, 2012, three days after the Debtors filed bankruptcy, the Bank wrote a letter to ELF
claiming the rebate check was collateral on a loan it made to Debtor Dudley Webb and
requested the ELF Check be issued to it jointly with the Debtor.  ELF complied, writing
by hand the words "and Bank of England" in the "pay to the order of" line on the ELF
Check behind the Debtor's name, and deposited the funds with the Bank on February 13,
2012.  The Bank is still holding the ELF Funds in a segregated account.  These facts were
testified to by a bank representative on April 11, 2012, and the Trustee attached a portion
of that transcript as Exhibit 8 to the Trustee's Motion for Summary Judgment.

The Trustee moves for summary judgment arguing that he is entitled to the ELF
Funds as a matter of law.  His argument is twofold:  one, the check was transferred to the
Bank post-petition and is therefore avoidable as a post-petition transfer under 11 U.S.C.
§ 549 regardless of any security interest the Bank may hold in the ELF Funds, and two,
the Bank does not have a security interest in the ELF check as it is a rebate arising from

---

Trustee's resources and to weaken the Trustee's ability to fulfill his fiduciary duty
to the estate.

Given the circumstances of this case, specifically the Bank's behavior, the Court will give
careful consideration to the Trustee's claims for surcharge as well as for claim disallowance,
equitable subordination and violation of the automatic stay discussed later in this Opinion.

the Debtors' ownership of 100 shares in ELF and the Bank does not have a security interest in the Debtors' ELF stock. The Bank also moves for summary judgment with respect to the ELF Funds arguing that it is entitled to these funds because it holds a security interest in all of the Debtor's fertilizer and accounts and other rights to payment.

With respect to the Trustee's first argument that the transfer of the ELF Check is avoidable pursuant to § 549(a)[33] as an unauthorized post-petition transfer of property of the estate, the Bank argues that while the check was transferred post-petition, it is dated pre-petition. The date of the check is irrelevant to this analysis. First, the check was initially made out to Debtor Dudley Webb, not the Bank. The check was only made out to the Bank and transferred to the Bank after it made a post-petition demand for the check. Accordingly, it was delivered to the Bank post-petition regardless of the date on the check. Second, in determining whether an avoidable transfer has occurred, the relevant date is the date the check is honored. *See In re Rainbow Music, Inc.,* 154 B.R. 559, 561 (Bankr. N.D. Cal. 1993) ("This Court concludes that, given the rule established for preferential transfers in [*Barnhill v. Johnson*, 503 U.S. 393 (1992)], the date of honor rule must also be used in the Section 549 context."); *see also In re Thomas,* 311 B.R. 75,

---

[33] Specifically, § 549(a) provides:
(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--
(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.
Subsections (b) and (c) are not applicable to this case.

80 (Bankr. W.D. Mo. 2004) *aff'd*, 317 B.R. 776 (B.A.P. 8th Cir. 2004) *aff'd*, 428 F.3d 735 (8th Cir. 2005). Because it is undisputed that the Bank demanded and received the ELF check post-petition and the Bank did not have authority from this Court to do so (such as through relief from the automatic stay), the transfer of the ELF check to the Bank is avoidable pursuant to § 549(a) regardless of whether the Bank has a security interest in the ELF Funds. Those funds are also recoverable from the Bank as the initial transferee under § 550(a)(1).[34]

Although the transfer of the ELF Check is avoidable, whether the Bank has a security interest in the ELF Funds is still an issue raised in this adversary proceeding that must be decided to determine the amount of the Bank's secured and unsecured claims.[35]

---

[34] Section 550(b)(1) provides a defense to a recovery claim for immediate or mediate transferees (as opposed to initial transferees) when the transfer is taken for value, in good faith, and without knowledge of the voidability of the transfer. That defense is not available to the Bank since it is the initial transferee of the ELF Check.

[35] Pursuant to 11 U.S.C. § 502(h), a creditor has a new claim for avoided property that retains its secured status. *See Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 67 (1st Cir. 2004) ("[T]he 502(h) claim takes on the characteristics of the original claim, including . . . its secured status."). A creditor's claim is secured to the extent of the value of its collateral, and unsecured to the extent that the debt owed to the creditor exceeds that value under § 506(a). Some courts have held that avoiding a transfer to a ***fully*** secured creditor under § 549 and allowing for recovery under § 550 is pointless because the estate would be required to return the avoided funds to the secured creditor in any case. *See e.g., In re Bankvest Capital Corp,* 375 F.3d at 71 ("The fact that [the secured creditor] would be entitled to receive exactly what it would be forced to return through avoidance renders avoidance pointless."); *see also In re C.W. Min. Co.*, 749 F.3d 895, 899 (10th Cir. 2014) ("[T]he relief of avoidance under § 549 and recovery under § 550 would be futile under the circumstances presented in this case because the Estate would be required to pay the Bank's secured claim of $383,099 in full, resulting in no benefit to the Estate."). In this case, the Bank's claim is not fully secured due to the higher priority of the USA's liens on most of the Bank's collateral.

However, the arguments on summary judgment illustrate that there is a material issue of fact as to the nature of the ELF Check. The Trustee maintains that the ELF Check was a rebate based on the Debtor's stock ownership in ELF whereas the Bank maintains the rebate flowed from the Debtor's purchase of fertilizer and that it is therefore covered by the Bank's security interest in the Debtors' farm products and supplies, or alternatively, that it constitutes proceeds of the Bank's collateral. Whether the Bank has a security interest in the ELF Funds is a factual issue that must be determined at trial.

## V.   BANK'S MOTION FOR SUMMARY JUDGMENT ON TRUSTEE'S COUNTERCLAIMS.

The Bank moves for summary judgment on the Trustee's Counterclaims, including the validity and perfection of its security interests in the rice and equipment/vehicles, the Carlton Farms Landlord's Share issue, and the issue of surcharge, all of which have already been decided by this Order. The Bank also seeks summary judgment on the following causes of action brought by the Trustee: (1) avoidance of pre-petition payments by the Debtors to the Bank in December 2011 (the **"December Transfers"**) as preferential transfers under 11 U.S.C. § 547; (2) avoidance of a payment by the Debtors to the Bank of the $89,178.87 Settlement Check as a preferential transfer; and (3) counterclaims against the Bank for disallowance of its claims, equitable subordination of its claims, and violation of the automatic stay based on the Bank's post-petition conduct. The Trustee maintains these counterclaims are factual in nature and cannot be resolved on summary judgment. The Court agrees with the Trustee.

58

A.      **The December Transfers.**

With respect to the December Transfers, which includes at least $1,261,320.61 in known payments, the Bank argues that there is no material issue of fact because the payments by Debtors did not enable the Bank to receive more than the Bank would have received in a Chapter 7 liquidation as required to establish an avoidable preference.  *See* 11 U.S.C. § 547(b)(5).  Specifically, the Bank argues the payments received by the Bank in December of 2011 were all proper payments against secured debts the Debtors owed the Bank, and, thus, each payment by the Debtors resulted in a reduction of the Bank's claim against such collateral. In other words, the Bank argues that there was no preferential transfer because the Debtors received equity in such collateral with each payment and these partial releases of the Bank's claim and increases in the Debtors' equity constitute the contemporaneous exchange of new value, which provides an absolute defense to the Trustee's claim pursuant to 11 U.S.C. § 547(c)(1).  The Bank is incorrect because it is not fully secured.

The requirements of 11 U.S.C. § 547(b)(5)(A)-(C), which are collectively referred to as the "hypothetical Chapter 7 test," provides that an avoidable preference exists only if the transferred property enables the creditor to receive more than it otherwise would under a Chapter 7 liquidation of the debtor's estate.   This Court explained the hypothetical Chapter 7 test in *In re Frankum*, 453 B.R. 352, 369 (Bankr. E.D. Ark. 2011):

The hypothetical Chapter 7 test compares two calculations: (1) the amount

59

a creditor would receive on its claim in a hypothetical Chapter 7 liquidation had no transfer been made (the **"hypothetical liquidation"**), and (2) the amount the creditor received from the allegedly preferential transfer combined with the amount the creditor would be entitled to receive on its claim in the actual bankruptcy case (the **"real liquidation"**). . . . If the real liquidation amount exceeds the hypothetical liquidation amount, the § 547(b)(5) requirement is met, and the transfer may be preferential.

This analysis is often simplified by examining whether the creditor was paid on an unsecured, a secured claim, or a partially unsecured claim. . . . As explained [in] *Auto-Train* [*Corp.*, 49 B.R. 605, 609-10 (Bankr. D.D.C. 1985)]:

> A creditor who receives payment on an unsecured claim has always been preferred because he does not release any collateral to the debtor. He has obtained an unfair advantage at the expense of other creditors because he has receive[d] a greater proportion of [his] unsecured claims than other unsecured claimants who received payment after liquidation. . . .
>
> On the other hand, a creditor who receives payment on a secured claim has not been preferred because he has merely realized the value of his collateral earlier than he would have if he had waited until liquidation. These payments do not deplete the debtor's estate, and thereby deprive other creditors of their fair share of payment.

*In re Auto-Train Corp.*, 49 B.R. at 610 (internal citations omitted). Stated another way, where the creditor has an unsecured claim, "as long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *In re Allegheny Health*, 292 B.R. 68, 78 (Bankr. W.D. Pa. 2003).

*In re Frankum*, 453 B.R. at 368 (some internal citations omitted). "Likewise, with respect to a partially secured debt, a payment to the creditor does not result in the release of an equivalent amount of collateral, and enables the creditor to receive more than he or she would have received in a Chapter 7 liquidation, and so may result in preference."

*Id.* (citing CJS BANKRUPTCY § 680).

The Court has concluded that the Bank has perfected security interests in both the Warehouse Rice and Farm-stored Rice and in the Debtors' equipment with the exception of the Vehicles for which no lien appears on the title.  The Bank still has at most a partially unsecured claim under 11 U.S.C. § 506(a).  The value of the collateral securing the Bank's loan is approximately $1.8 million (including rice and equipment with deductions for the Vehicles or Carlton Farms's Landlord Share which the Court has already decided are not subject to the claims of the USA or Bank); the Bank concedes that its lien is junior to the USA's perfected security interest in that collateral which totals approximately $860,000, leaving approximately $940,000 to secure the Bank's $1.4 million claim.  Accordingly, the Bank is only partially secured, and there is a factual issue remaining as to whether or not it received more than it would have in a Chapter 7 liquidation by receiving these payments.  To make this determination the Court needs evidence on how much the distribution to unsecured creditors in this case will be. Accordingly, the Bank's motion for summary judgment on this counterclaim is denied.

### B.   <u>The Settlement Check.</u>

The Debtors deposited a check in the amount of $89,178.87 (the **"Settlement Check"**) with the Bank on January 13, 2012, and those funds were immediately applied by the Bank towards a pre-existing debt of the Debtors to the Bank.  The Bank maintains that the Settlement Check was payment for the loss or damage to the Debtors' farm crops

61

pledged to the Bank and therefore constitutes proceeds of the Bank's collateral. The Trustee contends that the Settlement Check represents the Debtors' portion of a settlement in a class-action commercial tort claim involving genetically altered rice, and that the UCC-1 financing statement filed by the Bank does not provide with particularity that the commercial tort to which the Settlement Check relates is security for the Bank Loans. The Court finds that there is a factual dispute as to the nature of this check and whether the Bank has a security interest in it, and therefore, denies the Bank's Motion for Summary Judgment as to the Settlement Check. Additionally, even if the check does constitute proceeds of the Bank's collateral, the payment to the Bank may constitute an avoidable preference since the Bank is only partially secured, as discussed above.

**C.** **Disallowance of Claim, Equitable Subordination, and Violation of the Automatic Stay.**

The Trustee's counterclaim to disallow the Bank's claim is made under § 502(d) and (j) based, in part, on the Bank's receipt and retention of avoidable transfers. The Trustee also bases its claim to disallow the Bank's claim on the Bank's behavior in attempting to sell the Debtors' rice crop being stored at the Federal Drier post-petition, while the Bank had a Motion for Relief from Stay pending concerning the same property. Based on this same behavior, the Trustee seeks to subordinate the Bank's claim for purposes of distribution under principles of equitable subordination pursuant to 11 U.S.C. § 510(c). The Trustee also seeks damages resulting from the Bank's asserted control over the rice which the Trustee contends constituted a willful violation of the automatic

62

stay.

The Bank argues that there is no basis for the Trustee's claims to disallow the Bank's claim, for equitable subordination, and for violation of the automatic stay because the payments made to it were proper and are not avoidable, and because the Bank took no affirmative actions to take possession of property of the estate, and in fact did not take possession of property of the estate, or otherwise interfere with the Trustee doing so. The Bank maintains it took steps to preserve the rice by ensuring that the electric bills were paid to keep the bin-stored grain from spoiling and by maintaining insurance on the Debtors' property.

The Trustee argues that the Bank's actions were an attempt to exercise control over the disposition and sale of the Warehouse Rice and the Farm-Stored Rice, which forced the Trustee to file and seek a temporary restraining order, preliminary injunction, and an emergency full-day hearing related to such issues before the Court on April 12, 2012, in adversary proceeding 4:12-ap-1044. The Trustee incurred attorneys' fees in connection with bringing such action, and argues that neither this case nor the appeal would have been necessary had the Bank permitted the sale of the assets, then raised and joined the issues in a hearing on a motion for relief from stay or this adversary proceeding, and that accordingly, all legal fees associated with 4:12-ap-1044 and the appeals were caused by the Bank's actions.

These issues cannot be decided on summary judgment. The Trustee's efforts to

disallow the claim depend, in part, on the outcome of his avoidance actions which cannot be decided on summary judgment, as explained above. Disallowance of the Bank's claim based on its behavior, as well as equitable subordination and damages for violation of the automatic stay, must also be reserved for trial to ascertain the Bank's intent and the willfulness of its actions.

## CONCLUSION

For the reasons stated herein, each of the three motions for summary judgment currently pending in this case are granted in part and denied in part, as follows:

(1)    Summary judgment is granted to the USA and the Bank with respect to the validity and perfection of the security interests held by the Bank and the USA, with the exception of the Bank's and USA's security interests in the Vehicles.

(2)    Summary judgment is granted to the Trustee with respect to the perfection of the Bank's and USA's security interests in the Vehicles, and those liens are avoided pursuant to 11 U.S.C. § 544(a).

(3)    Summary judgment is granted to the Trustee with respect to Carlton Farms's Landlord Share, and the Trustee is entitled to reserve those funds for the benefit of the estate as the successor-in-interest to Carlton Farms.

(4)    Summary judgment is denied with respect to the issue of surcharge as issues of fact remain for determination after trial.

(5)     Summary judgment is granted in favor of the Trustee with respect to the ELF Check. The transfer of the ELF Proceeds to the Bank is avoided pursuant to § 549(a) as an unauthorized post-petition transfer.  However, there is an issue of fact regarding the nature of the ELF Check which must be resolved before the Court can determine whether the Bank has a security interest in the ELF Funds.

(6)     The Bank is denied summary judgment on the Trustee's counterclaims because these counterclaims are factual in nature and cannot be resolved on summary judgment.

A trial in this case is currently set for November 4, 2014, to resolve all pending claims in this adversary proceeding.

**IT IS SO ORDERED.**

Audrey R. Evans
United States Bankruptcy Judge
Dated:  10/23/2014

65